UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RUBEN R. GONZALEZ

Plaintiff

vs.

MAERSK LINE, LIMITED, and STANDARD
STEAMSHIP OWNERS' PROTECTION
AND INDEMNITY ASSOCIATION

Defendants

CIVIL NO. 10-2078 (PG)

**RESPONSE IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT AND
CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE COURT:

COMES NOW the plaintiff, RUBEN R. GONZALEZ**,** represented by his undersigned

attorneys, and respectfully pleads and prays as follows:

A *Motion for Partial Summary Judgment As To Punitive Damages And Memorandum of Law*

*in Support Thereof* [Dkt. 24] pends on the grounds that "*there is no evidence of wanton or willful*[1]

*failure to pay maintenance and cure*".   At issue is whether the conduct and activities of Maersk's

Directors and managers breached its obligation to pay the same to Gonzalez, and if such acts reached

that threshold of reprehensible and unlawful misbehavior that warrants an award of *punitive* damages.

**PLAINTIFF'S STATEMENT OF UNCONTESTED MATERIAL FACTS**

**Plaintiff's Statement of Uncontested Materials Facts** and exhibits  (Exh. 1-3), the **Statement**

**Under Penalty of Perjury** (Exh. 4), **List of Medical Expenses** (Exh. 5), **Plaintiff's  Counter**

---

[1] *Collins English Dictionary,* Third Edition (1994) defines the word **wanton** – "without motive, provocation, or
justification", and defines the word **willful** – "*intent on having one's own way; headstrong or obstinate. Intentional*".

**Statement of Material Facts** (Exh. 6-7) and **Plaintiff's Response to Defendant's Statement of Uncontested Material Fact** filed separately in the instant case are incorporated by reference.

**MEMORANDUM OF APPLICABLE LAW**

General maritime law requires "shipowners to ensure the maintenance and cure of seamen who fall ill or become injured while in the service of the ship." ***LeBlanc v. B.G.T. Corp.,*** *992 F.2d 394, 396 (1st Cir. 1993)* (internal citations omitted). "The term 'maintenance and cure' refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery . . . ." *Id. at 397*. The doctrine "derives from the 'unique hazards [which] attend the work of seamen,' and fosters the 'combined object of encouraging marine commerce and assuring the well-being of seamen.'" ***Vella v. Ford Motor Co.,*** *421 U.S. 1, 3-4, 43 L. Ed. 2d 682, 95 S. Ct. 1381 (1975)* A shipowner's duty to pay extends until the plaintiff fully recovers from his injuries or his condition is diagnosed as permanent. *Vella*, 421 U.S. at 4-5; ***Hubbard v. Faros Fisheries Inc.,*** *626 F.2d 196, 202 (1st Cir. 1980)*.  Once established, the seaman's entitlement continues until maximum medical recovery or maximum cure is reached.[2]  Maximum cure is the point at which "it appears probable that further treatment will result in no betterment of the seaman's condition."[3] It is the point at which "'it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition.'"[4]  The employer bears the burden of proving that maximum cure has occurred.[5]  **Vaughan v. Atkinson**[6] held that all ambiguities and doubts as to the seaman's right to receive maintenance and cure are to be resolved in the seaman's favor.  This rule applies to conflicting but credible medical

---

[2] **Vaughan v. Atkinson**, 369 U.S. 527, 531, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962); **Barnes v. Andover Co.,** 900 F.2d 630, 633-34 (3rd Cir. 1990); see also 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 6-28, at 376-77 (4th ed. 2004).
[3] **Pelotto v. L & N Towing Co.,** 604 F.2d 396, 400  (5th Cir. 1979).

[4] **Gaspard v. Taylor Diving & Salvage Co.,** 649 F.2d 372, 374 n.3 (5th Cir. 1981) (quoting **Pelotto**, 649 F.2d at 400).
[5] **Costa Crociere**, 939 F. Supp. at 1548.
[6] 369 U.S. 527, 532, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962

testimony as to whether the seaman has reached maximum cure, [7] and a seaman's right generally continues until a maximum cure determination is both unequivocal and made by a qualified medical expert.[8]

A vessel owner is obligated to investigate a claim before denying or terminating benefits,[9] and may refuse to pay maintenance and cure only "if a diligent investigation indicates that the seaman's claim is not legitimate or if the seaman does not submit medical reports to document his claim."[10] A failure to pay maintenance and cure due an injured seaman is reasonable if a diligent investigation indicates that the seaman's claim is not legitimate, *McWilliams v. Texaco, 781 F.2d 514, at 518-20 (5 Cir. 1986)*, or if the seaman does not submit medical reports to document his claim. *Id. at 519.*

The duty to pay maintenance and cure is "[a]mong the most pervasive incidents of the responsibility anciently imposed upon a shipowner."[11] It serves the "combined object of encouraging marine commerce and assuring the well-being of seamen."[12] These aims are accomplished by providing seamen with "essential certainty of protection against the ravages of illness and injury."[13] The duty to pay maintenance and cure is "so inclusive as to be relatively simple, and can be understood and administered without technical considerations. It has few exceptions or conditions to stir contentions, cause delays, and invite litigation."[14]

Punitive damages have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious

---

[7] See **Johnson v. Marlin Drilling Co.,** 893 F.2d 77, 79-80 (5th Cir. 1990) (applying **Vaughan** to resolve conflicts in medical evidence in seaman's favor).

[8] See **Vella v. Ford Motor Co**., 421 U.S. 1, 5, 95 S. Ct. 1381, 43 L. Ed. 2d 682 (1975) (maintenance and cure continues until incapacity is declared to be permanent); **Tullos v. Res. Drilling, Inc.,** 750 F.2d 380, 388 (5th Cir. 1985) ("'It is the [unequivocal] medical . . . determination of permanency that terminates the right to maintenance and cure.'" (quoting **Hubbard v. Faros Fisheries, Inc**., 626 F.2d 196, 202 (1st Cir. 1980).

[9] See **Vaughan**, 369 U.S. at 530-31, 533 (employer's default declared callous," "willful and persistent" because employer conducted no investigation into seaman's claim).

[10] *Morales v. Garijak, 829 F. 2d 1355, at 1360* (5 Cir. 1987).

[11] *Aguilar v. Standard Oil Co., 318 U.S. 724, at 730 (1943).*

[12] *Aguilar*, 318 U.S. at 727.

[13] *Vella, 421 U.S. at 4.*

[14] *Farrell v. United States, 336 U.S. 511, 516, 69 S. Ct. 707, 93 L. Ed. 850 (1949).*

disregard of the rights of others. *See The Amiable Nancy, 16 U.S. (3 Wheat.) 546, 558, 4 L. Ed. 456 (1818)* (criminal trespass); *Muratore v. M/S Scotia Prince, 845 F.2d 347, 354 (1st Cir. 1988)* (intentional infliction of emotional distress); *Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1051-52 (1st Cir. 1973)* (willful failure to pay maintenance and cure); *Pino v. Protection Maritime Ins. Co., 490 F. Supp. 277, 281 (D. Mass. 1980)* (tortious interference with employment rights).

Federal courts sitting in admiralty have the power, at least in some circumstances, to award common-law punitive damages to supplement statutory remedies. *Borkouski v. F/V MADISON KATE, 599 F.3d 57 (1 Cir. 2010)*; 2010 AMC 872; *Atlantic Sounding Co., Inc. v. Townsend, 129 S. Ct. 2561, 2567, 174 L. Ed. 2d 382 (2009)*; *Exxon Shipping Co. v. Baker, 554 U.S. 471, 128 S. Ct. 2605, 2619-21, 171 L. Ed. 2d 570 (2008)*.   The "prevailing rule in American courts also limits punitive damages to cases . . . of enormity, where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for the rights of others,  or behavior even more deplorable." *Exxon v. Baker, 128 S. Ct. at 2621.*   Punitive damages are aimed not at compensation but principally at retribution and deterring harmful conduct.[15]  This consensus informs the doctrine in most modern American jurisdictions, where juries are customarily instructed on the twin goals of punitive awards.[16]  The prevailing rule in American courts limits punitive damages to cases of what the Court in *Day v. Woodworth, 54 U.S. 363, at 371, 13 How. 363, 371, 14 L. Ed. 181 (1852),* spoke of as

---

[15]  See, *e.g., Moskovitz v. Mount Sinai Medical Center, 69 Ohio St. 3d 638, 651, 1994 Ohio 324, 635 N.E.2d 331, 343 (1994)* ("The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct"); *Hamilton Development Co. v. Broad Rock Club, Inc., 248 Va. 40, 45, 445 S. E. 2d 140, 143, 10 Va. Law Rep. 1449 (1994)* (same); *Loitz v. Remington Arms Co., 138 Ill. 2d 404, 414, 563 N.E.2d 397, 401, 150 Ill. Dec. 510 (1990)* (same); *Green Oil Co. v. Hornsby, 539 So. 2d 218, 222 (Ala. 1989)* (same); *Masaki v. General Motors Corp., 71 Haw. 1, 6, 780 P.2d 566, 570 (1989)* (same); see also *Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001)* (punitive damages are "intended to punish the defendant and to deter future wrongdoing"); *State Farm Mut. Automobile Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003)* ("[P]unitive damages . . . are aimed at deterrence and retribution"); 4 *Restatement § 908, Comment a.*

[16]  See, *e.g.,* Cal. Jury Instr., Civil, No. 14.72.2 (2008) ("You must now determine whether you should award punitive damages against defendant[s] . . . for the sake of example and by way of punishment"); N. Y. Pattern Jury Instr., Civil, No. 2:278 (2007) ("The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant . . . and thereby to discourage the defendant . . . from acting in a similar way in the future").

"enormity," where a defendant's conduct is "outrageous," 4 *Restatement § 908*(2), owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others," or behavior even more deplorable, 1 L. Schlueter, *Punitive Damages* §§ 9.3(A) (5th ed. 2005).[17]  Punitive damages and attorneys' fees are "proper only when a company's refusal to pay [maintenance and cure] is callous and recalcitrant, arbitrary and capricious, or willful, callous, and persistent.[18] The shipowner must have refused to pay without a reasonable defense and exhibited callousness and indifference to the seaman's plight." ***Legros v. Panther Services Group, Inc.,*** *863 F.2d 345, 352 (5th Cir. 1988).*

Punitive damages have long been an accepted remedy under general maritime law, and because nothing in the ***Jones Act[19]*** altered this understanding, damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law.  If the shipowner, in failing to pay maintenance and cure, has not only been unreasonable but has been more egregiously at fault, he will be liable for punitive damages and attorney's fees. ***Atlantic Sounding Co., Inc., v. Townsend,*** *129 S. Ct. 2561 (2009).* Courts have described this higher degree of fault in such terms as callous and recalcitrant, arbitrary and capricious, or willful, callous and persistent.  ***McWilliams***, *781 F.2d at 519*; ***Gaspard***, *649 F.2d at 375.*

As stated by the Court in  ***Morales v. Garijak,*** *829 F. 2d 1355, (5 Cir. 1987)* :

> "Thus, there is an escalating scale of liability: a shipowner who is in fact liable for maintenance and cure, but who has been reasonable in denying liability, may be held liable only for the amount of maintenance and cure. If the shipowner has refused to pay without a reasonable defense, he becomes liable in addition for compensatory damages. **If the owner not only lacks a reasonable defense but has exhibited callousness and indifference to the seaman's plight, he becomes liable for punitive damages and attorney's fees as well.**" *Morales*, at 1358 [Emphasis Ours].

---

[17]   Damages are designed not only as a satisfaction to the injured person, but likewise as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury to the action itself."  **Wilkes v. Wood**, Lofft 1, 18-19, 98 Eng. Rep. 489, 498-499 (C. P. 1763); see also ***Pacific Mut. Life Ins. Co. v. Haslip***, *499 U.S. 1, 25, 111 S. Ct. 1032, 113 L. Ed. 2d 1 (1991)* (Scalia, J., concurring in judgment) ("[P]unitive or 'exemplary' damages have long been a part of Anglo-American law").

[18]  ***Morales***, *829 F. 2d at 1358.*

[19]  *46 **United States Code** § 30104* (formerly *46 **U.S. C.** § 688*)

Courts have found such egregious conduct when the shipowner failed to conduct any investigation into a seaman's claim, *Vaughan, 369 U.S. at 530-31, 82 S. Ct. at 999;* withheld payments despite discovering through an investigation that the payments were due, *Parker v. Texaco, Inc., 549 F. Supp. 71, 77 (E. D .La. 1982)*[20]*;* rejected a documented claim because the seaman did not consult the owner before seeking treatment for his injury and because the seaman had filed suit, *Holmes v. J. Ray McDermott & Co., 734 F.2d 1110, 1119 (5th Cir. 1984);* or withheld payments on a pretextual basis or because the seaman rejected a settlement offer. *Robinson v. Pocahontas, Inc., 477 F.2d 1048, 1050, 1052 (1st Cir. 1973).*

**Tullos v. Resource Drilling, Inc.,** *750 F.2d 380 (5 Cir. 1985),* involved a challenge of the district court's decision to remove from the jury the question of arbitrary and capricious refusal by a ship owner employer to pay maintenance and cure where the employer *terminated* those benefits because "the medical evidence did not support plaintiff's claim that he had not reached maximum cure.".   Tullos argued that his employers were aware of his continued disability, refused to pay his maintenance stipend, and also all medical and hospital bills presented to them (except for those from medical examiners chosen by themselves), and that his employers were trying to render him destitute so that he would settle the case and were "physician shopping" to create issues relative to his medical problems.  The Fifth Circuit concluded that the medical diagnoses and prognoses were not so clear and consistent as to validate removing the issue of the employer's arbitrary and capricious denial of the maintenance and cure from the jury when extensive controversy was preset in the medical opinions.

In **Sullivan v. Tropical Tuna, Inc**., *963 F. Supp. 42*; *1997 AMC 2017 (D. Ma. 1997)* the Court held that the ship owner had breached its duty by delaying one month before approving a seaman's

---

[20]   In **Parker v. Texaco, Inc.,** ante, an employer refused to pay a seaman's medical bill even though it possessed a report related the seaman's hospitalization from the seaman's accident, and the court found that the failure to pay cure "*was clearly unreasonable, and even  fell to the level of being arbitrary and capricious.*"

surgery, and that this breach was both unreasonable and willful.  "[A]s the Fifth Circuit recognized in ***Guevara v. Maritime Overseas Corp.,*** *59 F.3d 1496 (5th Cir. 1995), cert. denied*, *516 U.S. 1046, 133 L. Ed. 2d 662, 116 S. Ct. 706 (1996),* "the obligation to provide maintenance and cure 'embraces not only the obligation to pay a subsistence allowance and to reimburse the seaman for medical expenses he incurs; the employer must take all reasonable steps to insure that the seaman who is injured or ill receives proper care and treatment." *Id. at 1500* (quoting Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 6-28, at 348 [2d ed. 1994]).  The Court in ***Sullivan***, ante, stated that "this Court observes that an injured seaman often will be unable to obtain necessary medical treatment unless he can first demonstrate the ability to pay. As a result, the Court holds that a ship owner's duty to pay maintenance and cure encompasses a duty to guarantee payment prior to treatment for all reasonable medical expenses.

When a ship operator fails to make a prompt, good faith investigation of a seaman's claim for maintenance and cure, or otherwise takes a "callous" or "recalcitrant" view of its obligations, the seaman may recover legal expenses on top of maintenance and cure. *See **Vaughan**, 369 U.S. at 530-31*; ***Roberts v. S.S. Argentina,*** *359 F.2d 430 (2d Cir. 1966)* (*per curiam*).

**Rodriguez-Alvarez v. Bahama Cruise Line, Inc**., *898 F.2d 312*; *1990 AMC 1290 (2 Cir. 1990),* held that the cruise line's handling of a seaman's claim was callous and recalcitrant (1) when the shipowner made no effort to locate a physician who could have performed whatever examination the shipowner deemed necessary; (2) when informed that the seaman would need three months of intensive physical therapy, the ship owner continued to do nothing, and consequently, the injured seaman was unable to receive the prescribed physical therapy; (3) when the employer persisted with its hardball tactics and refused to provide the seaman with a single penny until forced to do so; and (4) when the employer was consistently intransigent in responding to the injured  seaman's claim throughout.  "When a ship operator fails to make a prompt, good faith investigation of a seaman's

claim for maintenance and cure, or otherwise takes a 'callous' or 'recalcitrant' view of its obligations, the seaman may recover legal expenses on top of maintenance and cure." ***Rodriguez v. Bahama Cruise Line, Inc***., 898 F.2d 312, 316 (2d Cir. 1990).

***Borkouski v. F/V MADISON KATE,*** *599 F.3d 57 (1 Cir. 2010)* is cited in support of Maersk's position.  Here the Court held that an employer's violation of a statutory written requirement of which the employer was unaware which required giving seamen fixed written employment contracts before each trip, where the seamen had been paid under a lay-share system that "is not illegal or unjust", the imposition of punitive damages was not warranted because "Punitive damages do not, however, automatically follow a statutory violation. Ignorance of the law sometimes *can* be an excuse when it comes to punitive damages". *See, e.g.,* ***Kolstad v. Am. Dental Assoc***., *527 U.S. 526, 536-37, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999).*[21]

In **Johnson v. American Interstate Insurance Co.,** *2010 U.S. Dist. LEXIS 99176 (WD La. Sept. 2010)* an employer who had terminated plaintiff's maintenance payments sought dismissal of plaintiff's claim for punitive damages.  The seaman argued that his employer lacked any medical evidence suggesting maximum medical improvement had been reached, and that "reasonable minds can differ with regard to whether the employer's refusal to pay maintenance and cure was arbitrary and capricious".  The Court held in **Johnson** that sufficient evidence regarding whether defendant's termination of payments of maintenance and/or cure was arbitrary and capricious had been produced to demonstrate the existence of a genuine issue of material fact, and denied defendant's motion.

---

[21] Unlike the facts in **Borkouski**, Gonzalez was not paid his maintenance for more than 2 years, such payment took place six months after he filed suit, and Gonzalez is still owed a few thousand dollars for advances on medical care and treatment he receives.  The Manager who denied Gonzalez's benefits admitted she was fully aware of the employer's lawful duties and responsibilities under the law, she had access at all times to legal counsel, and Maersk chose not to investigate Gonzalez's medical status any further.

**DISCUSSION OF FACTS AND APLICABLE LAW**

When Gonzalez informed Maersk on October 29, 2008 that his knee surgery was scheduled with Dra. Ingrid Negrón for November 7, 2008, he provided details for the cost of the hospitalization, anesthesia, internist consultation, surgeon's fees, and pathologist; all physicians required their fees be paid beforehand , and that Dra. Negrón was owed $150.00 for services rendered and the address where the payment should be sent by Maersk.[22]   Maersk never responded to Gonzalez's letter of October 29, 2008.   Weeks later, and on November 14, 2008 Maersk was contacted by Mr. Amancio Crespo, SIU Representative, who requested that Maersk complete arrangements necessary for the guaranteed surgery.  Maersk has no record that Mr. Crespo's letter was ever answered or that Mr. Crespo was ever contacted by phone.  On November 19, 2008 Gonzalez again requested Maersk to contact Dr. Negrón's office and  arrange for his surgery.  <u>Maersk has no record that they ever responded to this letter</u>.  It was not until November 24, 2008 that Maersk contacted Dr. Negrón's office, and for such reason, the knee operation scheduled for November 7, 2008 did not take place .

On December 8, 2008, Dr. Negrón's office informed the SIU Medical Plan (Mr. Amancio Crespo and Kathy Oliver) the amounts of the medical fees, the billing codes for the procedures, and that letters of intention were required for the hospital, the anesthesiologist and the surgeon.  The same day Ms. O'Connell responded she would send the requested letters of financial responsibility next day but failed to do so, which resulted in an SIU-filed grievance because Maersk refused to provide the requested letters of financial responsibility.  <u>Maersk has no record that it sent the requested letters to guarantee payment of the operation.</u>  Days later Maersk sent an email but not the letter of financial responsibility being required, and SIU again reminded Maersk the letters of financial responsibility had

---

[22]   Maersk Line Limited never paid for these medical services.

to be sent in accordance with the assigned percentages agreed to between Maersk and the SIU.  Maersk responded to the SIU "***This is like extortion.  It would have been better if he [Ruben Gonzalez] found a different doctor.***"    Given Maersk's refusal, the December 16 knee operation did not take place.

On December 15, 2008, Gonzalez complained to Mr. Dennis Houghton, Director at Maersk, that his surgery had been unreasonably delayed, his health condition worsened, and Ms. O'Connell was being unresponsive in getting the surgery approved.  His health was being jeopardized, his other knee was starting to bother him and he had to walk with a cane, he was in pain, and the situation prompted serious personal issues with his wife and his children.  Mr.  Houghton and Ms. O'Connell never discussed this letter, and this Director never responded to Gonzalez's letter.  Dr. Negrón's office again requested the 3 letters of intent so the operation could take place on December 19, 2008, and reminded Maersk that $150.00 was owed for services rendered, but Maersk never requested a bill, never paid the same and Gonzalez became liable for its payment. Maersk did not send the requested letters and the [third] operation scheduled for December 19, 2008 could not take place - eighty seven (87) days after the accident.  Maersk admits that many people work at Maersk, that Cathy O'Connell, or her Administrative Assistant, or some other person at Maersk, could have gotten the letters out within a few hours or a few days, faxed or via overnight or courier mail. Ms. O'Connell admitted that she had  authority to guarantee all the medical costs of the intended knee operation, could have worked out the balance with the SIU Medical Plan at a later date, yet Maersk opted not to do so.  Simply said,, the payment guarantee letters requested by all physicians were never sent by Maersk - all to plaintiff's prejudice.[23]

---

[23]   Ms. O' Connell admits that she could have faxed a letter to the Doctor(s) or sent it in overnight mail,  procedures followed at Maersk on a normal basis.

Dra. Negron fees were set at $2,994.   The fees paid to Dr. Fernandez of $1,200.00 represented a savings to Maersk of almost $1,800.00.  Ms. O' Connell admitted that part of her job was to reduce the medical expenses paid for injured seamen.  This $1,800.00 savings needs to be contrasted with the consequences of the delay caused by Maersk for a 6 months period from the September 22, 2008 accident until the fourth scheduled operation performed on March 18, 2009; and the unnecessary pain and suffering caused resulting from Maersk's failure to comply with its obligation to provide cure, and the degree of additional disability which resulted from this delay.  Maersk admits that Gonzalez did nothing wrong in causing any of the delay in his treatment.  Adding insult to injury, after the third aborted operation, Gonzalez had to secure services from another surgeon given Maersk's high degree of obstruction, and a situation which this Manager described as "an extortion".  The delays from November 7, 2008 to the March 18, 2009 operation resulted from Maersk's total disregard of plaintiff's right to receive prompt medical care, from their unexplained failure to respond to letters sent by all concerned parties, and the jury should determine if under such circumstances, this employer acted with reckless indifference and abandon to plaintiff's plight and to his obvious entitlement to receive a much needed knee operation (cure).

Approval of the second surgeon's services was also a struggle.  Maersk Line Limited has admitted it has no explanation why it took sixty five (65) days (January 12, 2009 to March 18, 2009) to have the surgery performed by the second surgeon approved.

While Gonzalez was undergoing post-surgery physical therapy on July 2, 2009,[24]  Maersk sent him a letter stating that his unearned wages would no longer be paid, and threatened that if he should retain the services of an attorney to claim for damages, that Maersk would take a credit for all wages that were not due under the SIU contract.  About two months later, and on August 24, 2009 Joanne

---

[24] Maersk required Gonzalez to prepay 3 sessions in order for him to obtain physical therapy treatments.

Kubat from Maersk's Account Payable Department, wrote to Ms.  O' Connell stating Gonzalez wanted

his maintenance payments directly deposited to his account.  Cathy O' Connell responded  "*I suspect

that this will be his last unearned wage check.  I also think he has a lawyer in the background*."

On September 18, 2009, Maersk received information from Dr. Fernández's  office stating

seaman Gonzalez was still not fit-for-duty.  Maersk wrote and spoke to Dr. Fernandez, who on

September 22, 2009 issued a letter stating Gonzalez was fit-for- sea- duty.  Maersk then terminated

Gonzalez's  maintenance approx. $480.00 per month  and also his cure benefits effective October 1,

2009.  Contemporaneously, Maersk was also refusing to pay for medical services rendered by Dra.

Negrón on October 20 and October 22, 2008, and medical services previously rendered by Dr. Luis E.

Marquez.  The discontinued  payments of maintenance, refusal to reimburse advances for continued

medical treatment and physical o therapy, and delays to reimbursing other expenses, caused seaman

Gonzalez considerable physical, mental,  and serious economic hardship which resulted in the

foreclosure of his residence, lack of food and other necessities at home, required him to get further

indebted to partially meet his financial obligations, created more friction amongst his wife and sons,

and  this hardship and misfortune ultimately led him to seek psychiatric medical care in April, 2010

which Maersk has also refused to pay or otherwise reimburse him.  Again, this type of conduct should

be reviewed by a jury as part of this seaman's punitive damages claim.

The week after Dr. Fernandez issued his report Gonzalez visited Dr. Luis E. Marquez, the SIU

union physician, who on October 1, 2009 conducted an evaluation of his fitness to return to

employment as a seaman aboard SIU union crewed vessels, and who opined that Gonzalez continued

with pain, was disabled, and was Not-Fit-For Duty.  He ordered another MRI, which findings revealed

"*The previously noted horizontal tear through the posterior horn appears to have extended more

centrally.  These changes could also be post surgical in nature.*"  The MRI clearly confirmed that (a)

Gonzalez was not fit for duty, (b) he required further medical care and treatment for his knee, and (c) that as of October 1, 2009 had not achieved ***maximum medical cure***. The radiologist cautioned that his findings *"should be correlated with the surgical procedure performed."* Objective medical data now questioned and disputed the *fit-for-sea-duty* determination issued by Dr. Fernandez and the records and MRI were sent to Maersk in mid-October, 2009 in support of Gonzalez's claim for reinstatement of maintenance and cure. Now Maersk had medical information in its possession that seriously disputed, controverted and challenged Dr. Fernandez's opinion. Under no circumstances could any reasonable person conclude that with such disparity and conflicting medical opinions, and the results of the October 7, 2009 MIR, that Gonzalez had reached "*maximum medical cure*" and could go back to sea when the SIU union physician had certified he was unfit to work. Maersk was obligated by law to investigate the new medical evidence that conflicted with its existing medical data. More so when Maersk had predicated its decision to discontinue maintenance and cure benefits under the assumption that Gonzalez had reached "*maximum medical cure*" which evidently was no longer the case.

Despite an obvious controversy as to this seaman's condition and medical prognosis, and his claims for benefits' reinstatement, <u>Maersk did not contact Dr. Fernandez</u> to discuss the new medical evidence and/or need for a further evaluation. <u>Maersk did not contact Dr. Marquez</u> to discuss the medical evidence that prevented his employment as a seaman with the SIU union hall. <u>Maersk did not consult with a Registered Nurse</u> that Maersk Line Limited had used in the past when such differing medical data or opinions needed resolution. <u>Maersk did not retain an orthopedic doctor</u> or other physician of its choice in New Jersey (its main offices), or elsewhere, to consult with on the new medical data on the seaman's condition. In short, <u>Maersk did nothing to investigate the controversy</u>.[25] But by doing nothing, what Maersk did starting in October, 2009 and for 21 months thereafter - was to

---

[25]  At no time prior to the filing of the Complaint on November 3, 2010 did Maersk ever request Gonzalez to appear for an IME in Puerto Rico for an evaluation by a physician of its choice.

ignore seaman Gonzalez's plight, ignore his continuous request for maintenance and cure and those made by the SIU, and instead blindly adhered to medical information that had served as the basis of its decision to discontinue the maintenance benefits to this injured seaman, well knowing such findings was seriously disputed, controverted and challenged by the SIU physician's not-fit-for-duty determination, the MRI results of October 7, 2009, and the examination and evaluation of Dr. Alfred L. Axtmayer (and the supporting standing x-ray films) performed in late 2009 and early 2010 remitted by Dr. Marquez.[26] Maersk could not be medically certain that Gonzalez had reached maximum cure yet insisted on denying his maintenance and cure benefits, and only paid after suit was brought where punitive damages were being claimed from the damages resulting from the non-payment.

What prompted Maersk's reluctance to investigate even when squarely faced with conflicting diagnoses and prognoses on the status of his knee and need for further treatment ?  The answer is simple – for several years Maersk kept for itself  the use of over $8,500 by not paying the maintenance due[27]; it saved several thousand dollars by not conducting an investigation despite its admission that it could have consulted with a Registered Nurse or with a physician to review the medical documentation and issue an opinion, or to engage a physician of its selection to perform an independent medical evaluation of the injured seaman, and no reimbursement of approximately $3,000 in advances for medical services (see Exhibit 3) made to date.

## C O N C L U S I O N

The jury, as the triers of fact, need to resolve whether Maersk´s treatment of this seaman was in accord its obligations to provide *maintenance and cure* under the law, and if not, what amount of punitive damages should be imposed to prevent similar conduct from taking place with other seamen

---

[26] Dr. Alfred L. Axtmayer's May 5, 2010 letter recommended *"a surgical procedure and probably three months of rehabilitation prior to being capable of returning to work."*
[27]  In April of 2011 Gonzalez received a check for **$8,752.00** covering 547 days, a payment made six months after his lawsuit on November 3, 2010 which requested punitive damages for the delay and resulting damages involved.

in the future.  Their analysis would include Maersk´s delays for months to authorize payment for treatments and resulting delays in scheduled surgeries; Maersk's requiring Gonzalez to advance monies to pay for his medical treatments; Maersk's undue and unlawful reliance on one physician's report as a vehicle to terminate maintenance benefits in conjunction with their unlawful refusal to investigate and engage knowledgeable persons to opine on the matter; Maersk's unreasonable termination of maintenance for 547 days with resulting grave physical harm and mental damages; Maersk's continued refusal to reimburse medical expenses incurred; the substantial savings such acts generated to the employer, and if all such intentional, wanton and reckless indifference evidences their *bad faith* and abandon of plaintiff's plight.

Considering the burden of production associated with summary judgment motions, and the legal presumptions which attach to evidence produced by a non-movant, Plaintiff  has demonstrated that he is entitled to a cross motion for partial summary judgment; and/or the existence of numerous genuine issues of material fact of Maersk's  arbitrary and capricious conduct and abandonment of its legal obligations that warrant denial of Maersk's *Motion for Partial Summary Judgment,* and that  the factual determination of plaintiff's entitlement to punitive damages be ordered adjudicated by a jury of plaintiff's peers.

Respectfully submitted this 31[th] day of January, 2012.

I HEREBY CERTIFY that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System that will send notification of such filing automatically to all counsel of record.

S/JOSE F. SARRAGA
USDC-PR #118913
PO Box 9023962
San Juan, PR 00902
Tel: (787) 723-0505
Fax: (787) 724-5305
josarlaw@icepr.com

15

JACOB SHISHA, ESQ.
PRO HAC VICE
Tabak, Mellusi & Shisha, LLP.
29 Broadway
New York, NY 10006
Tel: (212)962-1590
Fax: (212)385-0920
email: jshisha@yahoo.com