**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

RUBEN R. GONZALEZ,

     Plaintiff,

        v.                              CIV. NO. 10-2078 (PG)

MAERSK LINE, LIMITED, ET. AL.,

     Defendants.

---

## OPINION AND ORDER

    Pending before the Court is defendant Maersk Line, Limited's motion for partial summary judgment (Docket No. 24), the plaintiffs' opposition thereto (Docket No. 48) and the defendant's reply (Docket No. 51). For the reasons set forth below, the Court **DENIES** the defendant's motion.

### I. BACKGROUND

    On November 3, 2010, Plaintiff Ruben R. Gonzalez (hereinafter "Plaintiff" or "Gonzalez") filed the above-captioned claim against Maersk Line, Limited (hereinafter "Maersk" or "Defendant" or "the company") and its insurer, the Standard Steamship Owners' Protection and Indemnity Association (hereinafter "the Association"), for negligence under the Jones Act, 46 U.S.C. § 30104, and under general maritime law, see 28 U.S.C. § 1333. Plaintiff alleges that on or about September 22, 2008, he suffered an accident aboard the Maersk's ship, the MAERSK TEXAS, while working as a member of the crew of said vessel. According to Gonzalez, he is now disabled as a result of said accident. The Plaintiff claims, among other things, that the ship was unseaworthy and that his accident was the result of the Defendant's carelessness, recklessness and negligence in that regard. In addition, the Plaintiff alleges that Maersk has willfully and arbitrarily failed to pay Plaintiff's maintenance and cure. Furthermore, Gonzalez alleges that he has incurred in out-of-pocket expenses for medical services and medicines in treating his medical condition following the accident. According to Plaintiff, Maersk has ignored and disregarded his requests for reimbursement. As a result, Plaintiff claims Maersk's conduct entitles him to an award of punitive damages pursuant to Atlantic Sounding Co., Inc. v. Townsend, 129 S.Ct. 2561 (2009). See Docket No. 1 at ¶¶ 20-24. In the complaint, Gonzalez requests a trial by jury.

## II. STANDARD OF REVIEW

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Sands v. Ridefilm Corp., 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, see DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. See Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. See Suarez v. Pueblo Int'l, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). However, "summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. See Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir.2002). The Court must review the record "taken as a whole," and "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000). This is so, because credibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Id.

### III. FINDINGS OF FACT

Before setting forth the facts found by this Court to be undisputed and relevant to the matter at hand, we must first address several compliance issues noted by the Court when reviewing Defendant's and Plaintiff's statements of facts and supporting evidence.

"Documents supporting or opposing summary judgment must be properly authenticated." Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir.2000) (citing FED.R.CIV.P. Rule 56(e)). To be admissible at the summary judgment stage, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). See 10A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 2722 (3d ed.1998). "Under Federal Rule of Civil Procedure 56(e), on summary judgment, the parties in their supporting affidavits shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Hoffman v. Applicators Sales And Service, Inc., 439 F.3d 9, 14 (1st Cir.2006). "Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Id. "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." Robinson v. Bodoff, 355 F. Supp. 2d 578, 582 (D.Mass.2005) (striking all exhibits that were submitted without affidavits).

Moreover, a party must not "[overlook] the crucial point that documents do not automatically become a part of the record simply because they are the products of discovery." Hoffman, 439 F.3d at 15. "If a party wishes the court to consider matters disclosed during discovery, he must take appropriate steps to have them included in the record: merely citing to pages of discovery materials not of record does not suffice." Id.

After a careful review of the record, we find that some of the materials submitted by the Defendant are inadmissible for the purposes of summary judgment inasmuch as some of the exhibits attached in support of its statements of fact lack an authenticating affidavit or fail to indicate whether they stem from discovery materials on file. As a result, unless admitted by the opposing party, the Court did not consider the proposed factual statements that were not properly supported by the record on file.

Additionally, the Court notes that the Plaintiff offered a statement under penalty of perjury in support of the statements of fact attached to his

opposition. The same was signed after the Defendant's motion for summary judgment had been filed, which itself suggests to the Court "that the Statement was made solely to create an issue of fact for the purpose of surviving summary judgment." Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc., 447 F.3d 105, 110 (1st Cir.2006) (holding district court did not abuse discretion in disregarding affidavit submitted in support of plaintiff's opposition to summary judgment, since statements therein conflicted with answers plaintiff had given in her deposition, and plaintiff failed to provide satisfactory explanation for subsequent change in testimony). In his response, the Plaintiff fails to explain the need to supplement his deposition testimony with a sworn statement. Therefore, the Court will disregard the contents of the Plaintiff's sworn statement to the extent that it is basically a repetition of the allegations in the complaint and the arguments set forth in the opposition.

As per the foregoing discussion, the Court found the following relevant facts were undisputed:

1.   On August 4, 2008, Gonzalez joined the M/V MAERSK TEXAS as an Able Bodied seaman.

2.   On August 23, 2008, Mr. Gonzalez had signed foreign articles for the duration of three months aboard the MAERSK TEXAS with articles to expire on or about November 23, 2008.

3.   On September 22, 2008, Gonzalez sustained an injury to his right knee aboard the M/V MAERSK TEXAS at sea near the coast of Africa.

4.   After sustaining the injury, he was provided with first aid treatment aboard the ship including ice and ibuprofen after a ship's officer spoke to a medical advisory assistant in the United States.

5.   Gonzalez remained on the MAERSK TEXAS until she arrived in Savannah, Georgia on or about October 10, 2008, and on that date, signed off the ship to seek medical treatment.

6.   Gonzalez was seen at the industrial medicine clinic in Savannah, Georgia. The physician there recommended an MRI on Mr. Gonzalez's right knee and further evaluation treatment and physical therapy upon his return to Puerto Rico. Upon his return to Puerto Rico, Gonzalez sought medical treatment from **Dr. Luis Marquez**, a primary care physician, on October 14, 2008.

7.   On October 14, 2008, Dr. Marquez examined Ruben Gonzalez and recommended that he consult with **Dr. Ingrid Negron**, an orthopedist, and that

CIV. NO. 10-2078 (PG)                                                            Page 5

Gonzalez obtain an MRI of his right knee. Dr. Marquez wrote out a prescription for the MRI.

8. Before contacting the Defendant to discuss financial arrangements, Gonzalez went to see his union representative to notify the union about the accident.

9. On October 14, 2008, **Amancio Crespo**, the union representative, wrote to **Dennis Houghton** (hereinafter "Houghton"), General Manager at Maersk, formally requesting maintenance and cure and unearned wages for Mr. Gonzalez. Crespo advised Houghton that Mr. Gonzalez would be using **Seafarers Health Medical Benefit**, Cigna, as a primary insurer and the company was to bear all remaining and related medical financials relating to the injury.

10. Mr. Crespo's letter of October 14, 2008 requesting maintenance and cure included a supporting not-fit-for-duty slip. Dr. Marquez's not-fit-for-duty slip indicated a history of an accident aboard the ship, a diagnosis of right knee injury with tenderness and inflammation. It stated that Plaintiff needed an MRI as soon as possible, and that he needed a consultation with an orthopedist. It also indicated that Ruben Gonzalez was not fit for duty at least through November 14, 2008.

11. By October 17, Mr. Crespo's letter had also been received by **Cathy O'Connell** (hereinafter "O'Connell"). Cathy O'Connell worked at Maersk as a Jones Act Claims Manager and examiner since 1992 until December 31, 2009, and as a consultant thereafter until December 31, 2010. Since 1992, Cathy O'Connell's job was primarily handling personal injury claims involving seamen on Maersk Line ships, and she was responsible for handling all the seamen's requests for maintenance and cure. O'Connell was responsible for making sure that the medical treatment that was provided to seamen by physicians was paid.

12. Mr. Crespo's letter to O'Connell dated October 14, 2008 requested maintenance and cure and unearned wages for Mr. Gonzalez. It also requested that O'Connell contact Mr. Gonzalez's physician to arrange for an understanding between her company providing to the operation expenses and for the guarantees for the required medical attention urgently needed by Mr. Gonzalez.

13. The practice at Maersk is that if someone gets hurt on a ship and is going to need medical treatment, the captain should advise him to contact Cathy O'Connell, or somebody at Risk Management, to get specific

instructions on how to get his medical bills paid and how to get his maintenance and unearned wages.

14. The majority of the time, O'Connell would make a decision as to whether or not Maersk would pay maintenance, and when it would be paid, based on her knowledge of the law. When she had a question or was not sure, Maersk had lawyers available that she consulted.

15. O'Connell was aware that the ship owner must diligently and promptly pay all medical bills and maintenance payments, and that the ship owner must diligently and promptly arrange for medical treatment, if needed.

16. O'Connell does not have anything in her file evincing that Maersk ever responded to the October 14, 2008 grievance letter.

17. Cathy O'Connell does not know why nobody at Maersk responded to Mr. Crespo's request for maintenance and cure from October 14 until October 24, 2008.

18. On October 24, 2008, Amancio Crespo sent a letter to Mr. Houghton containing a formal grievance for the following reasons:

    a.   The company is refusing to answer a request previously sent for maintenance & cure and unearned wages;

    b.   The company is refusing to provide the Union with an accident report and a letter assuming financial responsibilities for all non-covered required medical services and prescriptions to be consumed by the member in relation to the accident;

    c.   The company is deliberating, undermining and over-looking Plaintiff's serious health situation by not responding as requested, thereby jeopardizing the health and well-being of a union member, hereby decreasing the chance of a rapid healing and the proper and recommended treatment process.

19. On October 27, 2008, Cathy O'Connell wrote to Ruben Gonzalez and advised him on how to submit medical bills to the Seafarers International Union's ("SIU") insurer, Cigna Health Care in Scranton, PA. The letter also advised that he would receive unearned wages until the end of Articles, which expired on November 23, 2008 and thereafter he would receive maintenance payments at the rate of $8 per day in accordance with the collective bargaining agreement between Maersk and the SIU, which provided that in the event of any injury or illness that manifests itself aboard the ship, the seafarer will be covered by the Seafarers

Health and Benefit Plan (SHBP) with Maersk making up any differences in coverage.

20. O'Connell does not know or remember why it took ten days to get her October 27, 2008 letter out to Plaintiff with details on his medical benefits and entitlement to unearned wages.

21. Pursuant to the relevant collective bargaining agreement, maintenance is supposed to be paid weekly.

22. If O'Connell should have a suspicion or any question about whether a seaman had reached maximum medical improvement or was fit for duty, she could ask for an independent medical examination ("IME"). On many occasions in the past, O'Connell had hired physicians to conduct IMEs.

23. Gonzalez saw Dr. Negron on October 20, 2008 and October 22, 2008.

24. Plaintiff underwent an MRI on October 20, 2008, which disclosed that he had a complex tear of the medial meniscus involving the posterior horn and central portion of the meniscus with small joint effusion. Notably, in the particular cartilage of the patella, femoral condyles and tibia plateau appeared normal.

25. On October 29, 2008, Dr. Negron wrote to **Ms. Joy Daniels** at Maersk outlining the costs of the arthroscopy that she intended to perform at Presbyterian Hospital in San Juan. She outlined the fees for the surgery, including hospital costs, anesthesia, internist consultation, surgeon fees and pathology totaling $11,300, including her $7,000 surgical fee. Dr. Negron demanded that they be paid in advance.

26. Dr. Negron sent Joy Daniels, who helped O'Connell at Maersk, a fax dated October 29, 2008 stating that Mr. Gonzalez was scheduled for knee surgery on November 7, 2008, and that the fee for her services for the initial consultation was $150.00.

27. O'Connell admitted she did not have concern that if the surgery was not done within a week when it was delayed, it could somehow impact Mr. Gonzalez's ability to heal, or the final result, or could somehow be detrimental. O'Connell did not consult with anybody, and did not see any medical reports, or anything, that would address whether there was any risk of doing further damage of having Mr. Gonzalez walking around on a knee or moving a knee that needed surgery.

28. On November 12, 2008, **Kathie Oliver**, a port representative for the Seafarers International Union, emailed Dr. Ingrid Negron, whose email address is healthyjointsforever@yahoo.com, advising that Seafarers

Health and Benefits Plan (SHBP) does not pay in advance for any procedure. She also explained that any amounts not covered by SHBP would be paid by the company.

29. About one and a half hours later after Kathie Oliver sent her email, Dr. Negron replied with the quotes for her surgeon fees which amounted to $5,376. Dr. Negron asked for a letter of intention that would cover 100% of those fees in a week after the surgery. Two days later, Kathie Oliver replied to this email advising that a letter of intention would be forthcoming with the estimated payment for CPT code.

30. On November 14, 2008, Amancio Crespo wrote to Cathy O'Connell at Maersk asking her to contact Plaintiff's physician in order to guarantee the amounts that were not covered by the SHBP. Crespo also requested maintenance and the reimbursement of prescriptions.

31. On November 17, 2008, the SHBP wrote back to Dr. Negron analyzing the CPT Codes, advised that her total charges were $5,380 of which the plan would pay $5,022.31. The main reduction was due to a 50% allowance for multiple surgeries as per CPT guidelines.

32. On November 19, 2008, Dr. Negron emailed Kathie Oliver advising that the fees were acceptable with the exception of the 50% reduction for procedures in addition to the primary procedure. She recited that she had problems in the past with the Seafarers Health Plan and that if she did not receive a Verification Health Form that would pay 100% of all charges, she was not interested in performing the surgery.

33. On November 19, 2008, Mr. Gonzalez sent a fax asking Cathy O' Connell to contact Dr. Negron's office and make arrangements for his surgery. Cathy O'Connell received it on November 21, 2008. Plaintiff also told O'Connell about the $150 that was outstanding from the October 29, 2008 visit to Dr. Negron and was still not paid. In said fax, Mr. Gonzalez also told O'Connell that his right knee was not getting better and that his left knee was starting to bother him, possibly due to putting weight upon that knee when he walked. Mr. Gonzalez asked Cathy O'Connell to contact Dr. Marquez for an authorization to pay his fees.

34. O'Connell does not remember if she responded to Mr. Ruben Gonzalez's fax of November 19, 2008.

35. Maersk does not know of and does not have on file any documentation or any communication with Dr. Marquez between November 19, 2008 and September 21, 2010.

36.   On November 24, 2008, Cathy O'Connell emailed Dr. Negron and advised her that Maersk was prepared to pay the outstanding balance of reasonable and customary charges not covered by the Seafarers Health Plan within thirty days of receipt of the bill and explanation of benefits (EOB) from the Seafarers Health Plan. O'Connell also told Dr. Negron that her request for payment in advance for 100 percent of the surgical procedures was highly unreasonable and unfair to her patients who were seeking her medical expertise.

37.   **Rafael Diaz**, Dr. Negron's Office Manager, responded to O'Connell's e-mail of November 24, 2008 indicating that they had had problems in the past getting paid by Seafarers, but that Dr. Negron would accept a letter of guarantee of payment in lieu of prepayment.

38.   On December 8, 2008, Amancio Crespo contacted Rafael Diaz at Dr. Negron's office and asked that Diaz forward to Crespo all related itemized bills and costs for surgery, as well as any old and unpaid medical bills relating to the SIU members.

39.   Mr. Crespo also wrote to Cathy O'Connell and Kathie Oliver by email advising that Dr. Negron would reconsider performing surgery on Mr. Gonzalez and asking that a letter be sent to the Hospital to guarantee anesthesia costs, to the surgeon and to a Mr. Alamo, as soon as possible.

40.   Cathy O'Connell responded to Mr. Crespo on December 8, 2008 and stated: "I'll get my letter out tomorrow by way of e-mail."

41.   On December 11, 2008, Crespo wrote to Mr. Houghton invoking the collective agreement's grievance procedure and advising that the company refused to provide a letter of financial responsibility as a secondary guarantor, even though it had previously agreed to do so. Crespo advised that the hospital administration informed him that they had a space available in the operation room for Gonzalez on Tuesday, December 16th or Friday, December 19, 2008. He asked that the company provide the required letter of guarantee immediately.

42.   On December 12, 2008, Crespo emailed Cathy O'Connell and Kathie Oliver advising that Dr. Negron needed a letter from each stating that the particular itemized bill included in a letter plus the cost for anesthesia (40% of the total cost of the operation) and the cost for hospitalization would be paid in full by both parties in accordance to

their respective assigned percentages. If the letter was sent by December 12th, the operation would take place on Monday, December 15th.

43. On December 12, 2008, Cathy O'Connell sent to Dr. Negron an email stating that "MLA will pay outstanding balances not paid by Seafarers." She also asked when Gonzalez would be scheduled for surgery.

44. On December 12, 2008, Crespo sent a letter to Cathy O'Connell concerning the requested letter of guarantee, and she received it on December 12, 2008 at 2:05.58 p.m. She responded to Mr. Crespo "This is like extortion. It would have been better if he found a different doctor."

45. On December 12, 2008, Crespo sent a letter to Dennis Houghton requesting a Port Committee Meeting to discuss the two pending grievances "due to all the health complications and medical services delay caused by the company."

46. On December 15, 2008, Cathy O'Connell sent a second email to Dr. Negron reiterating that Maersk would pay to Dr. Negron, to the anesthesiologist and the Hospital all outstanding balances not paid by the Seafarers Union for the surgery performed on Ruben Gonzalez's right knee. She also advised that Gonzalez was not responsible for any co-pays or any medical expenses relating to his knee injury.

47. Dr. Negron's administrator responded an hour later to Cathy O'Connell's second email on December 15, 2008 stating that the letter of intention should include a statement that the Seafarers Union Plan agreed to pay each CPT code at 100% which will be divided between Seafarers at 65% and Maersk at 35%. Dr. Negron's assistant wanted 3 letters of intention and advised that a balance of $150 was outstanding which he had sent by email.

48. Cathy O'Connell responded to the administrator's email with a third email on December 15, 2008 at approximately 5:30 p.m. stating that her email did include Dr. Negron, the anesthesiologist in the hospital and confirming that Maersk would pay 35% of the 100% of the balance billed to Dr. Negron. The administrator responded to Cathy O'Connell on the next morning, December 16, 2008 advising that "we are not in the same channel." Apparently, he needed an affirmative statement that each CPT code would be paid at 100% and not 50% and that a formal letter that complied "with our requirements" had to be sent to his office. The administrator's email states in pertinent part: "In order to do this procedure properly, you need to prepar[e] three letters one for the

hospital that includes all the information regarding the annual deductible one for anesthesia that includes the go ahead of Ms. Alamo and one for us saying that you agree to pay each CPT code at 100%. Each letter should include that Seafarers will pay 65% and MLL will pay 35%, the billing address of each company and all the particulars. Emails will not be acceptable as letter of intention."

49. The letters of intent requested by Dr. Negron's office were never sent out by Maersk.

50. On December 15, 2008, Plaintiff wrote a letter to Mr. Houghton wherein Plaintiff told Houghton that his surgery had been delayed and his condition had worsened because of Ms. O'Connell not being responsive and her unprofessional behavior on getting his surgery approved. He also states that the situation is putting his health in jeopardy, that the other knee's starting to bother him because he's putting weight on his other knee, he walks with a cane, and his mobility has worsened. He has pain, and the whole issue has been a personal struggle, for him, his wife, and his kids. The December 15, 2008 letter also requests that Mr. Houghton, as Director at Maersk, take matters to address and resolve the problem so his three months' delayed surgery can take place.

51. On December 16, 2008, the SHBP sent a Verification Form to Dr. Negron setting forth the charges for the surgery and the plan allowance and advising that the plan would pay 65% of the reasonable and customary allowance for an out-of-network provider.

52. On December 16, 2008, Mr. Crespo sent an email to Ms. O'Connell and Dennis Houghton to set a conference in order to get somebody from Maersk to guarantee payment for the surgery.

53. On December 17, 2008, Crespo sent to Cathy O'Connell and Kathy Oliver a letter dated December 17, 2008 from Dr. Negron's office that indicated that Maersk was to be responsible for $2,944.11 out of the total amount of the surgical fees they needed guaranteed.

54. On December 18, 2008, Plaintiff wrote a letter to O'Connell stating that he had been waiting for almost three months for his surgery, and that his condition was not getting better. O'Connell never responded to his letter.

55. Dr. Negron did not perform the surgery on Mr. Gonzalez. Cathy O'Connell advised Plaintiff to obtain another doctor. Mr. Gonzalez looked in the Yellow Pages and found **Dr. Orlando Fernandez**. However, Mr. Gonzalez was

not certain whether it was Cathy O'Connell who did not want to pay Dr. Negron or whether it was Dr. Negron who did not want to operate.

56.  On January 5, 2009, Amancio Crespo and Plaintiff wrote to Cathy O'Connell advising that Mr. Gonzalez had not received his unearned wages check pertaining to the month of December of 2008.

57.  Mr. Gonzalez emailed Dennis Houghton on January 6, 2009 advising that his emails to Cathy O'Connell were being returned as not delivered.

58.  Mr. Houghton replied on January 6, 2009 that he had forwarded Mr. Gonzalez's letter to Cathy O'Connell.

59.  Plaintiff acknowledged receipt of his unearned wages for the month of December by email dated January 9, 2009 and advised that his new doctor was Dr. Orlando Fernandez.

60.  Mr. Gonzalez first went to see Dr. Fernandez on or about January 10, 2009.

61.  After seeing Dr. Fernandez, Plaintiff called Cathy O'Connell to make the relevant arrangements for surgery to perform a medial meniscectomy.

62.  On January 13, 2009, Dr. Fernandez's office manager wrote to Cigna (Kathie Oliver) advising that his fee would be $1,200.00 plus the pre-operation procedure, anesthesia and surgery room. He asked that Ms. Oliver authorize the surgery. O'Connell received this letter too.

63.  Amancio Crespo and Kathie Oliver exchanged emails on January 13 2009 regarding authorization to Dr. Fernandez for the surgery. Ms. Oliver responded that the paperwork was with the supervisor who was reviewing the procedures.

64.  Crespo wrote to Cathy O'Connell on January 26, 2009 that Ms. O'Connell had not sent any request for reimbursement on the money owed by the company to Mr. Gonzalez regarding the accident, wages and deductible. O'Connell wrote back that she had not heard from Mr. Gonzalez since the beginning of January.

65.  On January 26, 2009, Plaintiff wrote to O'Connell stating his surprise at her response, since he had spoken to her on January 12, 2009, and he attempted to call her office continuously since January 22, 2009 to remind her about his wage payments to avoid a repeat of the December delay.

66.  Ms. O'Connell responded on January 26, 2009 stating that the last time they spoke he was supposed to see the doctor and to let her know what was said. She had not received any report on his status, and any bills

that had been sent to her were paid or sent to the SIU for payment. The bills would be sent first to Cigna and then to Maersk.

67. On January 29, 2009, Plaintiff sent an email to Kathie Oliver asking her to contact Dr. Fernandez to authorize surgery, and a reminder on January 30, 2009.

68. On January 31, 2009, Ms. Oliver wrote back stating that the plan had changed the processing program which they are all learning.

69. Crespo sent an email to Kathie Oliver on February 12, 2009 referring to a conversation "last Monday" and stating that it was imperative that a letter of approval for the knee operation be sent as soon as possible. Ms. Oliver responded that she had passed the request to a supervisor who was still working on it.

70. On February 25, 2009, Mr. Gonzalez wrote to O'Connell referring to a telephone conversation of February 23, 2009 and advising that the surgeon needed to talk to Ms. O'Connell as soon as possible, as SIU had already contacted the surgeon's office. Plaintiff also indicated that the surgeon's office was trying to contact her without any success.

71. Ms. O'Connell spoke to Mr. Gonzalez's surgeon's office about the surgery, but on March 1, 2009, Plaintiff wrote to Ms. O'Connell that she had to send a fax to the hospital to authorize the surgery and to pre-admission, admission and anesthesia.

72. On March 2, 2009, Mr. Gonzalez spoke with Maersk's payroll, which did not know anything about his unearned wages and maintenance payment for the month of February. Mr. Gonzalez wrote to Ms. O'Connell asking for instructions to payroll to make those payments.

73. On March 2, 2009, Ms. O'Connell wrote to San Juan Health Center, to the attention of the admissions office and advised that Maersk would be responsible for reasonable and customary outstanding medical bills not paid by Cigna.

74. On March 16, 2009, Mr. Gonzalez wrote to Ms. O'Connell that he was having problems with admissions (laboratory and x-rays) and asked Ms. O'Connell to call them. His surgery was scheduled for Wednesday, March 18, 2009, but it was postponed because of the problems with the lab and x-rays, which did not accept the health care plan.

75. Dr. Fernandez performed the medial meniscectomy on March 18, 2009.

76. On May 15, 2009, Mr. Gonzalez wrote to Ms. O'Connell advising that he would be receiving his first physical therapy on May 20, 2009. The

therapist accepted Cigna but Gonzalez had to pay the deductibles. He promised to send the receipts for the deductibles.

77.   On May 21, 2009, Mr. Gonzalez sent to Ms. O'Connell the receipt for his first physical therapy.

78.   A second physical therapy receipt was sent on May 26, 2009 by Mr. Gonzalez to Ms. O'Connell.

79.   On June 1, 2009, Mr. Gonzalez wrote to Ms. O'Connell stating that he could not reach her by telephone and advised her that he had to interrupt his therapy due to lack of money. His last therapy took place on the past Friday (May 29, 2009) because his mother had loaned him the money. He asked for his unearned wages and maintenance as soon as possible as well as the cost of the therapies already paid. However, SIU advised him that the therapy was not covered by the health plan benefit.

80.   On June 17, 2009, Mr. Gonzalez wrote to Ms. O'Connell asking her to make arrangements with the clinic to pay for his remaining five physical therapies, and that he had paid for three physical therapies and had only received one reimbursement.

81.   Cathy O'Connell wrote back on June 17, 2009 to have physical therapy call her office to set up billing.

82.   Mr. Gonzalez wrote back to Ms. O'Connell on June 19, 2009 asking her to make the arrangements.

83.   Ms. O'Connell wrote back to Mr. Gonzalez on July 2, 2009 advising that she had spoken with the physical therapy group and had agreed to pay $420.00 in advance for his therapy. She also reminded Mr. Gonzalez that Maersk had no continuing obligation to pay his wages and that she would continue paying wages for the month of July. O'Connell further stated that if he retained the services of an attorney and wished to pursue a further claim for damages, Maersk would take a credit for all wages paid that were not due pursuant to the SIU contract.

84.   However, Mr. Gonzalez advised on July 8, 2009 that he spoke to physical therapy and they did not have any knowledge about Maersk's agreement to pay the therapies.

85.   Mr. Gonzalez was able to undergo a second set of physical therapy sessions in August of 2009.

86.   On August 24, 2009, O'Connell received an e-mail from a **Joanne Kubat**, who works in the Accounts Payable Department at Maersk, informing her that Ruben Gonzalez wanted direct deposit payment. Cathy O'Connell wrote

back indicating she suspected this would be Plaintiff's last unearned wages check, and that she also thinks he has a lawyer in the background.

87.  On August 30, 2009, Mr. Gonzalez wrote to Ms. O'Connell advising that he was still due to undergo three therapy sessions plus a visit to the doctor. He asked Ms. O'Connell to contact Ms. Vega at the therapy office, as the funds that were previously remitted had already been used up.

88.  Mr. Gonzalez underwent three therapy sessions in May of 2009, seven therapy sessions in August of 2009 and three therapy sessions in September of 2009.

89.  On September 21, 2009, Cathy O'Connell wrote to the orthopedist surgeon Dr. Fernandez and questioned him why Ruben Gonzalez had not reached maximum medical improvement by this time.

90.  On September 22, 2009, Mr. Gonzalez was seen by Dr. Fernandez, who advised that Mr. Gonzalez had reached maximum medical improvement and he could not find a reason why Mr. Gonzalez could not return to work effective October 1, 2009. According to Dr. Fernandez, it was the patient who stated that he could not return to work.

91.  On the very day Dr. Fernandez said that Plaintiff was fit for duty, Gonzalez went to get a physical from the Seafarers Health and Benefit Plan.

92.  Dr. Marquez performed a physical examination on Mr. Gonzalez on October 1, 2009 and found that Mr. Gonzalez had limitation of motion in his right knee. He advised that Mr. Gonzalez needed further review and recommended an evaluation by **Dr. Alejandro Perez**. Dr. Marquez found Gonzalez not-fit-for-duty. Dr. Marquez also issued a prescription dated October 5, 2009 for a right knee MRI.

93.  As of October 1, 2009, Maersk stopped paying Plaintiff his maintenance benefits because Dr. Fernandez had said that he had reached maximum medical improvement and was fit for duty.

94.  After October 1, 2009, Plaintiff made numerous requests for maintenance and cure, but he did not receive payment for any maintenance in 2009 or in 2010.

95.  Maersk and Cathy O'Connell agree that Dr. Marquez is the one who has to determine whether the seafarer ("seaman") meets the Coast Guard Guidelines.

96. Maersk had the right to ask Plaintiff to go through an independent medical examination ("IME") with anyone selected by Maersk. O'Connell remembers this has been done in prior situation where conflicting reports from two doctors existed.

97. On October 7, 2009, Cathy O'Connell got a letter from Dr. Alejandro Perez, a sports and physical medicine rehabilitation doctor that was treating Mr. Gonzalez, who indicated that Ruben Gonzalez should get an MRI. He indicated in his examination that there is some mild to moderate anterior instability, and that he found some atrophy and point tenderness.

98. The MRI ordered by Dr. Marquez demonstrated that Gonzalez had a previously repaired medial meniscus tear which appeared to have extended more centrally. There was also small to moderate size joint effusion and some loss of articular cartilage involving the lateral aspect of the central and posterior aspect of the medial femoral condyle.

99. On October 13, 2009, Ruben Gonzalez wrote to Cathy O'Connell enclosing his October 7, 2009 MRI results.

100. On October 20, 2009, Plaintiff was asking for his maintenance because he was not fit for duty, could not work on any ship. He reminded O'Connell about his appointment with Dr. Alejandro Perez, and that he was waiting for a reply regarding his maintenance.

101. On October 29, 2009, Gonzalez wrote to Cathy O'Connell indicating that he does not have any money to pay the deductibles required to see a doctor, and that his bank balance is zero since Maersk stopped paying his maintenance.

102. On October 29, 2009, Plaintiff indicated that since Cathy O'Connell hadn't responded to his email, he had lost his appointment with Dr. Alejandro Perez. He also indicated that Dr. Negron's office was still asking for payment for the $150 that was owed her from back on October 29, 2008.

103. Cathy O'Connell did not contact Dr. Negron's office and ask them to send a bill for payment and she does not know why not.

104. A Connecticut doctor, **Dr. Alfredo Axtmayer**, came to Puerto Rico and examined Mr. Gonzalez at attorney Jose Sarraga's office in San Juan on two occasions. Dr. Axtmayer ordered long leg weight bearing films to determine whether Mr. Gonzalez had an abnormal weight bearing axis.

105. On November 10, 2009, Dr. Axtmayer wrote that Gonzalez had sustained a torn medial meniscus of his right knee "with a fairly healthy joint otherwise." According to Dr. Axtmayer, sometime between the initial MRI in October 2008 and the second MRI in October 2009, the patient has had changes in the meniscus which appear to be post-operative and there is now a loss of articular cartilage involving a lateral aspect of the central and posterior aspect of the medial femoral condyle. Dr. Axtmayer advised that the knee might be addressed with medical management including injection therapy, a possible repeat arthroscopy and if there is severe articular damage, then a partial knee replacement.

106. On January 13, 2010, Dr. Axtmayer advised that with loss of articular cartilage and an abnormal weight bearing axis, he needed to obtain long leg films from hip to ankle to determine if the weight bearing axis from the center of the femur through the knee to the center of the ankle. If the center fell medially, they would indicate a knee that is not going to get better without further intervention. A partial knee replacement would then be considered.

107. Dr. Axtmayer reviewed the long leg weight bearing films and found that Gonzalez did have a minimally abnormal weight bearing axis which meant that he had damage to his medial articular surface and his medial meniscus that is causing ongoing problems with his knee in terms of pain and buckling. Dr. Axtmayer recommended a partial knee replacement.

108. On March 26, 2010, Amancio Crespo wrote to Cathy O'Connell requesting an update on the status of the company's non-payment of Plaintiff's maintenance and cure.

109. Cathy O'Connell's file contains Dr. Marquez's note dated June 9, 2010 wherein, according to Dr. Marquez, Mr. Ruben Gonzalez was not-fit-for-duty from September 22 through October 22, 2010. Dr. Marquez also indicated that Plaintiff needed orthopedic surgery, or a consult with an orthopedic surgeon, and that he needed a psychiatrist at that point.

110. Dr. Marquez sent Maersk a letter dated June 11, 2010 recommending that orthopedic surgeon Dr. Axtmayer evaluate Ruben Gonzalez, and if required, proceed with surgery of his knee. Dr. Marquez included a copy of Dr. Axtmayer's report of May 5, 2010.

111. On July 2, 2010, Mr. Gonzalez wrote to Cathy O'Connell and informed her about the May 5, 2010 report issued by Dr. Axtmayer that he required

surgery, requested Maersk pay the required maintenance from October 1, 2009 to July 31, 2010, and requested her to confirm receipt of his letter. Cathy O'Connell does not know if she responded to this letter, and her file does not contain a response to his letter.

112. Cathy O'Connell never responded to Ruben Gonzalez's letter of July 2, 2010. From November 2009 until Cathy O'Connell left her employment at Maersk on December 31, 2010, Maersk has no record that she ever consulted with any physician as to Mr. Gonzalez's claim for maintenance and cure. Nobody at Maersk requested an independent medical examination in 2009 or 2010.

113. Ruben Gonzalez's letter of September 21, 2010 states that he had notified Cathy O'Connell months ago that he had required another knee surgery, and he never received any answer to any requests for treatment. He also reminded O'Connell that he had not received any maintenance payments since October 2009.

114. Cathy O'Connell is aware that under the law a ship owner has an obligation to diligently investigate maintenance and cure claims.

115. On November 3, 2010, Plaintiff filed the above-captioned claim.

116. Cathy O'Connell has no explanation as to why it took Maersk from October 1, 2009 to March 2011 to pay Plaintiff his maintenance of $8,752.00.

117. Gonzalez has been declared permanently unfit for duty by his treating primary care physician, Dr. Luis Marquez.

118. Maersk Line Limited had Gonzalez examined by Dr. Jose Suarez-Castro, a San Juan Orthopedist, who totally disagrees with Dr. Axtmayer and believes that Gonzalez is far from being a candidate for knee replacement. Gonzalez has full range of motion in the knee, no effusion in the knee and no instability in the knee. In his report of July 11, 2011, Dr. Suarez found that the wear on the medial condyle was normal for Plaintiff's age and occupation and the meniscal tear minor; if the meniscal tear was symptomatic, a simple arthroscopic surgery would remedy the problem. His recommendation was a course of physical therapy to revive the wasted muscles in his quadriceps.

119. Although his Articles expired on November 23, 2008, Maersk paid Mr. Gonzalez his full wages until October 2009, when Dr. Fernandez found Mr. Gonzalez to be at maximum medical cure and fit for duty. Although maintenance payments ceased in October 2009, they were resumed on or about March 25, 2011 when all maintenance payments that were due and

owing to Mr. Gonzalez were fully paid by Maersk. Maersk continues to pay maintenance and cure up to this date.

## IV. DISCUSSION

In its motion for partial summary judgment, defendant Maersk argues that the Plaintiff's delay in receiving medical treatment were the fault of the physician, Dr. Negron, in refusing to accept the Union plan and insistence on a letter providing guarantees from both the Union and Maersk; that "[Maersk's] temporary interruption of maintenance and cure benefits was a reasonable response to Dr. Fernandez's fit for duty and maximum medical cure declaration, especially considering that Dr. Fernandez was a treating physician," Docket No. 24 at page 7. Maersk also asserts that there is no evidence that it acted wantonly, willfully, capriciously or in bad faith, as required by law for the imposition of punitive damages. See Docket No. 24.

Plaintiff opposed the Defendant's motion and cross-moved for summary judgment. See Docket No. 48. In Gonzalez's version of events, Maersk delayed its authorization of payment for treatments for months, resulting in the postponement of scheduled surgeries; Maersk required Gonzalez to pay for his medical treatments in advance; Defendant unlawfully relied on one physician's report to terminate maintenance benefits and refused to investigate the matter; and, Maersk illegally terminated Plaintiff's maintenance for 547 days, all resulting in grave physical harm and mental damages. Gonzalez now argues that genuine issues of material fact exist as to whether Defendant's conduct was arbitrary, capricious, willful and callous. Thus, Plaintiff asserts that a jury, as the triers of fact, needs to resolve whether or not Maersk´s acted in accordance with its obligation to provide maintenance and cure under the law, and if not, what amount of punitive damages should be imposed to prevent similar conduct from taking place with other seamen in the future. See Docket No. 48.

### A. Maintenance and Cure

"Where a seaman suffers injury or falls ill while in the service of a ship, the owner and the ship are liable, regardless of fault, for the seaman's maintenance and cure." Boudreau v. S/V Shere Khan C, 27 F.Supp.2d 72, 83 (D.Me. 1998). "Maintenance and cure is designed to provide a seaman with food and lodging when he becomes sick or injured in the ship's service; and it extends during the period when he is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." Vaughan v. Atkinson, 369 U.S. 527, 531 (1962). See also LeBlanc v. B.G.T. Corp., 992 F.2d 394 (1st

Cir.1993) ("The term "maintenance and cure" refers to the provision of, or payment for, food and lodging ("maintenance") as well as any necessary health-care expenses ("cure") incurred during the period of recovery from an injury or malady.").

> Once it attaches, the right to maintenance and cure continues until the sailor is so far cured as possible. … A sailor unable to make a full recovery does not receive a lifetime's maintenance and cure; rather, the right to, maintenance and cure ceases once the sailor's treating physicians declare the condition permanent and incapable of being improved.

Boudreau, 27 F.Supp.2d at 83 (internal citation and quotation marks omitted). When there are ambiguities or doubts, they are resolved in favor of the seaman. See Vaughan, 369 U.S. at 532 (citing Warren v. United States, 340 U.S. 523 (1951)).

Punitive damages have been recognized as an available remedy where the shipowner's refusal to pay maintenance stemmed from a wanton and intentional disregard of the legal rights of the seaman. See Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1st Cir.1973). In Atlantic Sounding Co., Inc. v. Townsend, 129 S.Ct. 2561 (2009), the Supreme Court held that, under the appropriate factual circumstances, an injured seaman may recover punitive damages for his employer's willful and wanton disregard of the obligation to pay maintenance and cure. See id. While discussing the history of punitive damages as a common law remedy, the Supreme Court pointed out that "[t]he jury's broad discretion to set damages included the authority to award punitive damages when the circumstances of the case warranted." Id. at 2566.

Nevertheless, "[n]ot all intentional behavior constitutes "reckless indifference for the rights of others."" Borkowski v. F/V MADISON KATE, 599 F.3d 57, 62 (1st Cir.2010) (citing Exxon Shipping Co. v. Baker, 554 U.S. 471, 489-493, 128 S.Ct. 2605, 2619-21 (2008)). "[T]he prevailing rule in American courts … limits punitive damages to cases … of enormity, where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for the rights of others, or behavior even more deplorable." Borkowski, 599 F.3d at 61-62 (citing Baker, 128 S.Ct. at 2621). Finally, "[t]he award of punitive damages lies within the discretion of the factfinder … ." Babbidge v. Crest Tankers, Inc., No. 89-0232, 1991 WL 432058 at *3 (D.Me. March 19, 1991) (internal citations omitted).

We need decide here whether or not Maersk's conduct might support a punitive damages award.

The Plaintiff complains that the Defendant willfully failed to properly provide cure by delaying approval of his surgeries and failing to promptly reimburse him for his medical expenses. It has been established that the Plaintiff first had to submit medical bills to the SHBP and Maersk would make up any differences in medical coverage. After Gonzalez sustained his injury on September 22, 2008, he visited an orthopedist surgeon in Puerto Rico, Dr. Negron, on October 14, 20 and 22 of 2008. On October 29, 2008, Dr. Negron wrote to Maersk outlining the fees and other conditions to be met for Plaintiff's surgery. The operation was initially scheduled for November 7, 2008. As it stems from the record, SHBP, Maersk and Dr. Negron engaged in several phone conversations and exchanged written messages regarding Dr. Negron's multiple demands to perform the surgery. However, the plan and the Defendant were unable to meet some of Dr. Negron's multiple demands, which she was also unwilling to concede. As a result, Plaintiff had to seek another surgeon on or about January of 2009.

The Court finds that Maersk's Jones Act Claims Manager, Cathy O'Connell, was not exactly hasty in her responses to Plaintiff and Dr. Negron. Nevertheless, the Court believes that the delay in Plaintiff's treatment by Dr. Negron was not entirely the fault of the Defendant. And while "a shipowner's duty to pay maintenance and cure encompasses a duty to guarantee payment prior to treatment for all reasonable medical expenses," Sullivan v. Tropical Tuna, Inc., 963 F.Supp. 42, 45 (D.Mass. 1997), the Court finds that Defendant duly complied with this duty at this stage of Plaintiff's treatment.

In January of 2009, four months after his injury, Plaintiff sought the medical attention of a different doctor, namely, Dr. Fernandez. The Plaintiff also complains about the delays in the scheduling of the surgery Dr. Fernandez was to perform on his injured knee. Gonzalez first visited Dr. Fernandez on January 10, 2009, and three (3) days later, Dr. Fernandez sent a letter to the medical insurer requesting authorization for Plaintiff's surgery. It stems from the record that it was not until February 25, 2009 that Plaintiff informed Maersk that the plan had finally authorized the surgery. By March 2, 2009, the Defendant had complied with the Plaintiff's request to send its written guarantee of payment. All further delays after said date were admittedly due to internal problems at the hospital where the surgery was due to take place. Therefore, the Court also finds that Maersk complied with its cure obligation towards Plaintiff with regards to Dr. Fernandez's treatment.

After the surgery took place on March 18, 2009, Gonzalez was scheduled to receive his first physical therapy post-surgery on May 20, 2009. Gonzalez paid deductibles and sent Maersk the receipts for reimbursement. Gonzalez also requested Maersk that it pay in advance the therapies not covered by the plan. According to the record, Gonzalez was able to complete three therapy sessions in May of 2009, seven in August and three more in September. Although O'Connell required some reminders on the part of Plaintiff, the Court finds that Maersk responded to Plaintiff's requests for reimbursement and for advance payments of his physical therapies within a reasonable amount of time.

After Gonzalez attended several therapy sessions, O'Connell questioned Dr. Fernandez as to Plaintiff's recovery status. Gonzalez saw Dr. Fernandez on September 22, 2009 and the latter concluded that Plaintiff had reached maximum medical improvement and that he could not find a reason why Gonzalez could not return to work effective October 1, 2009. According to Dr. Fernandez, it was the patient who stated that he could not return to work. Notwithstanding, on October 1, 2009, Plaintiff sought a physical examination from his primary care physician, Dr. Marquez, who found he was not fit for duty inasmuch as he had a limitation of motion in his right knee. Dr. Marquez also issued a prescription dated October 5, 2009 for a right knee MRI. At that point, Maersk ceased its maintenance and cure payments in light of Dr. Fernandez's conclusion. However, the MRI ordered by Dr. Marquez demonstrated that Gonzalez had sustained further damage to the previously repaired knee. On October 13, 2009, Gonzalez sent his new MRI results to O'Connell. In addition, a Connecticut doctor, Dr. Axtmayer, examined Gonzalez at his attorney's office in San Juan on two occasions. Dr. Axtmayer ordered further tests and eventually concluded that Plaintiff's knee would benefit from injection therapy, a possible repeat arthroscopy and a partial knee replacement. There is evidence on record that Maersk's files contain a note from Dr. Marquez dated June 9, 2010 wherein he states that Gonzalez was not-fit-for-duty from September 22 through October 22, 2010.

Between October of 2009 and October of 2010, both union representative Crespo and Plaintiff contacted Maersk requesting Plaintiff's maintenance and cure payments to no avail. Moreover, during this time frame, there is no evidence on record at Maersk that it ever investigated Gonzalez's claim by submitting him to an independent medical examination or otherwise. Finally, on November 3, 2010, Plaintiff filed the above-captioned claim, and some time

in March of 2011, Maersk reinstated its maintenance and cure payments to Plaintiff.

In its motion, the Defendant uses Dr. Fernandez's fit-for-duty assessment to justify withholding payments for maintenance and cure to Plaintiff. We must now determine whether or not Defendant was reasonable in its denial of benefits or was more egregiously at fault.

As previously stated, "the right to maintenance and cure continues until the sailor is so far cured as possible … . [T]he right to, maintenance and cure ceases once the sailor's treating physicians declare the condition permanent and incapable of being improved." Boudreau, 27 F.Supp.2d at 83 (citing Farrell v. United States, 336 U.S. 511, 518 (1949); Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 201-02 (1st Cir.1980)). After carefully reviewing the record, the Court agrees with the Defendant that, at first, it had a reasonable defense in refusing to pay maintenance and cure when Dr. Fernandez, Plaintiff's treating physician, declared that Gonzalez had reached maximum medical improvement in October of 2009. However, "in applying the law of maintenance and cure, ambiguities or doubts are to be resolved in favor of the seaman." Sullivan, 963 F.Supp. 42, 45 (citing Vaughan, 369 U.S. at 532). Shortly after Dr. Fernandez's assessment, the Plaintiff established doubts as to his medical condition when Dr. Marquez's determined, after a physical examination, that he was not fit for duty because of Plaintiff's limitation of motion in his right knee. In addition, Gonzalez sent O'Connell the MRI results of October of 2009 showing his right knee had not yet healed and Dr. Axtmayer's assessment report concluding Plaintiff needed further treatment. It stems from the uncontested facts in this case that Plaintiff and his union representative attempted to contact Maersk on several occasions in order to demonstrate Plaintiff had not yet reached maximum medical improvement and was entitled to have his maintenance and cure payments renewed. However, the Defendant ignored their pleas for over a year. Though the Defendant asserts in its motion that it was "never unresponsive to Gonzalez," see Docket No. 24 at page 21, the record reflects otherwise.

"Upon receiving a claim for maintenance and cure, the shipowner need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." Sullivan, 963 F.Supp. at 46 (finding shipowner breached cure obligation by delaying one month before approving seaman's surgery, and breach was both unreasonable and willful; holding one month was far longer than shipowner's insurer needed to conduct reasonable

investigation) (citing Morales v. Garijak, Inc., 829 F.2d 1355, 1358 (5th Cir.1987)). In the case at hand, Maersk did not investigate Plaintiff's claim until after he was forced to file the present suit in November of 2010 and did not pay maintenance and cure until March of 2011, eighteen (18) months after having ceased payments.

"If the shipowner, in failing to pay maintenance and cure, has not only been unreasonable but has been more egregiously at fault, he will be liable for punitive damages and attorney's fees." Galveston County Nav. Dist. No. 1 v. Hopson Towing Co., Inc., 92 F.3d 353, 358 (5th Cir.1996) (citing Morales v. Garijak, Inc., 829 F.2d 1358 (5th Cir.1987)). "[T]he cases in which punitive damages … have been granted share the common element of a shipowner's default, either in failing to provide maintenance and cure or in failing to investigate an injured seaman's claim." Breese v. AWI, Inc., 823 F.2d 100, 103 (5th Cir.1987) (citing Harper v. Zapata Off-Shore Co., 741 F.2d 87, 89-90 (5th Cir.1984)).

> Courts have found such egregious conduct when the shipowner **failed to conduct any investigation** into a seaman's claim, withheld payments despite discovering through an investigation that the payments were due, rejected a documented claim because the seaman did not consult the owner before seeking treatment for his injury and because the seaman had filed suit, or withheld payments on a pretextual basis or because the seaman rejected a settlement offer.

Morales, 829 F.2d at 1360-61 (internal citations omitted) (emphasis ours). See also Tullos v. Resource Drilling, Inc., 750 F.2d 380, 388 (5th Cir.1985) ("Examples of employer behavior that could merit punitive damages have included (1) laxness in investigating a claim; (2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer; (3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically.").

The Court notes that some courts have required "a showing of bad faith on the part of a shipowner to support an award of punitive damages … ." Breese, 823 F.2d at 103. Nevertheless, "[b]ecause the determination of whether a seaman has reached maximum recovery is "a medical question, not a legal one," the element of bad faith can be inferred from an employer's complete failure to consult a medical source in deciding to terminate maintenance and cure payments." Nelon v. Cenac Towing Co., LLC, No. 10-373, 2011 WL 289040 at *22 (E.D.La. January 25, 2011) (citing Breese, 823 F.2d at 104).

Finally, Plaintiff also claims that Maersk never paid a $150 initial consultation fee to Dr. Negron. Regarding this claim, it stems from the uncontested evidence on record that on October 29, 2008, Dr. Negron sent Maersk a fax stating, among other things, that the fee for her services for Gonzalez's initial consultation was $150. Three (3) weeks later, Plaintiff sent O'Connell a fax informing her, among other things, that the $150 fee for his visit to Dr. Negron was still not paid. Thereafter, on December 15, 2008, Dr. Negron's administrator e-mailed O'Connell advising her that a balance of $150 was still outstanding. A year later, on October 29, 2009, Plaintiff informed O'Connell that Dr. Negron's office was still asking for payment for the $150 that was owed to her since October 29, 2008. There is no evidence on record that Maersk ever responded to these requests for payment.

Although the Defendant seeks dismissal of Plaintiff's request for punitive damages in connection with the claim that Maersk defaulted on its maintenance and cure obligation, the Court finds that genuine issues of material fact that preclude summary judgment on the issue of punitive damages exist. After careful review of the record and the applicable caselaw, we conclude that Gonzalez has presented sufficient evidence entitling him to have the jury resolve whether Maersk's failure to pay Dr. Negron's $150 initial consultation fee, its reliance on Dr. Fernandez's assessment to terminate benefits for the period of October of 2009 through March of 2011 and its failure to investigate Plaintiff's claim in view of conflicting medical diagnoses and prognoses were in fact arbitrary, capricious, wanton, willful and in bad faith.

### V. CONCLUSION

For the reasons stated above, this Court hereby **DENIES** the Defendant's motion for partial summary judgment (Docket No. 24).

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, July 5, 2012.

<u>S/ JUAN M. PEREZ-GIMENEZ</u>
JUAN M. PEREZ-GIMENEZ
SENIOR U.S. DISTRICT JUDGE